# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

FERNANDO D. BOLDEN,

                    Defendant.

Case No. 24-CR-2-JPS

**ORDER**

## 1.    INTRODUCTION

In January 2024, a grand jury returned an Indictment charging Defendant Fernando D. Bolden ("Defendant") with, inter alia, knowing possession of a firearm as a felon and knowing possession with intent to distribute various controlled substances including fentanyl. ECF No. 1. Defendant now moves to suppress the fruits of a March 2023 search of 7169 N. 42nd Street in Milwaukee (the "Residence") on the ground that the affidavit in support of the search warrant application failed to establish probable cause that Defendant resided at the Residence or that evidence would be found there. ECF No. 27. Alternatively, Defendant moves for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) (a "*Franks* hearing"). *Id.*

Magistrate Judge Stephen C. Dries recommends that the motion be denied in its entirety. ECF No. 37. Defendant has objected to that recommendation, ECF No. 39, the Government has responded to the objection, ECF No. 40, and Defendant has replied to that response, ECF No. 41. The recommendation is accordingly ripe for the Court's review.

For the reasons discussed herein, the Court concludes that the affidavit in support of the search warrant application failed to establish probable cause to search. Nevertheless, the Court concludes that the good faith exception applies. The Court also concludes that Plaintiff has not made a substantial preliminary showing that Milwaukee Police Department ("MPD") Officer Matthew Brooks ("Brooks") knowingly and intentionally, or with reckless disregard for the truth, included material misrepresentations—or omitted material information—from the affidavit in support of the search warrant application. The Court accordingly adopts in part and overrules in part Magistrate Judge Dries's report and recommendation and will deny Defendant's motion to suppress and for a *Franks* hearing.

## 2.     BACKGROUND

In December 2022, a confidential informant told MPD officers that a dealer known as "Blessed" had, while armed, previously attempted to give the informant a sample of crack cocaine. ECF No. 27 at 1 (citing Ex. A (affidavit in support of application for search warrant; electronically stored with Clerk of Court) ¶ 11); *see also* ECF No. 37 at 2 (citing Ex. A ¶ 11). The informant told officers that this interaction with "Blessed" occurred near 7000 W. Brown Deer Rd. and that "Blessed" lived somewhere in the area of N. 43rd St. and W. Good Hope Rd. Ex. A ¶¶ 11, 14.[1] The informant also told officers that "Blessed" was an approximately 25-year-old Black male who drove both a red BMW and a silver sedan, and who would sell 1 gram of

_____

[1] This area—N. 43rd St. and W. Good Hope Rd.—is about a block away from the Residence. ECF No. 27 at 6. "W. Good Hope Rd." is occasionally referenced in the filings, and repeated here, simply as "Good Hope."

Case 2:24-cr-00002-JPS     Filed 11/22/24     Page 2 of 36     Document 42

crack cocaine for $60.00. *Id.* ¶¶ 12, 25. The informant also provided a phone number for "Blessed." *Id.* ¶ 13.

Brooks ran the plates of the red BMW and learned that the vehicle was registered to a Latia N. Johnson ("Johnson"), whose address was listed as that of the Residence (a duplex). *Id.* ¶¶ 15, 26. Utility records for the Residence were in Johnson's name. *Id.* ¶ 17. Brooks determined through "a records check using Milwaukee Police Department resources" that Johnson and Defendant were in a relationship. *Id.* ¶ 16.[2] He further determined that Defendant matched the physical description of "Blessed" given by the informant. *Id.* The informant was shown a recent booking photo of Defendant and confirmed that it was "Blessed." *Id.* ¶ 18. Brooks also consulted public court records, which revealed that Defendant was a convicted felon. *Id.* ¶ 19.

On the morning of March 21, 2023, Detective Richard Ticcioni ("Ticcioni") was conducting unrelated undercover surveillance in the rear parking lot of the Residence when a silver Nissan Altima sedan pulled alongside his vehicle. *Id.* ¶ 20. Ticcioni captured on video[3] a Black male exiting the silver Nissan with a silver handgun in his right hand, which the male then pocketed. *Id.* ¶ 21. The male then approached the rear door of the Residence. *Id.* ¶ 22. The video shows that, as the male approaches the rear door, he appears to transfer car keys from one hand to the other, and as he

---

[2]It is not clear what these "resources" were; Defendant represents that the only "known public record" linking Defendant and Johnson was a paternity action—listing separate addresses for Defendant and Johnson—filed in Milwaukee County Circuit Court in 2022. ECF No. 27 at 2 n.3.

[3]*See* Ex. B (electronically stored with Clerk of Court).

reaches the door of the Residence, a honk sounds (seemingly from the now-offscreen Nissan) indicating that it has been remotely locked. Ex. B.

Brooks thereafter completed a police report, writing that "Ticcioni observed and video recorded the individual . . . entering the rear door of [the Residence] with keys." ECF No. 39-1 at 1. Brooks later averred in an affidavit in support of an application for a warrant to search the Residence that Ticcioni stated that the male "used keys to open the rear door" and then entered the Residence. Ex. A ¶ 22. Brooks also swore that the video corroborated Ticcioni's version of events and that the male in the video was Defendant. *Id*. ¶ 24.

Brooks drafted a search warrant application for the Residence, the red BMW, and the silver Nissan, supported by the aforementioned affidavit. *See* ECF No. 39-1 at 1–2; *see also* Ex. A. The warrant described the objects of the search as including firearms, ammunition, magazines, holsters, documentation of firearm possession, and items or records establishing who is in control of the Residence. Ex. A at 1. On March 24, 2023, a court commissioner signed the warrant. *Id.* at 7.

On March 27, 2023, prior to the execution of the search warrant, officers arrested Defendant nearby after seeing him leave the Residence armed with a handgun. ECF No. 39-1 at 2. During his arrest, Defendant dropped his keys, which included a set of BMW keys, house keys, and a safe key. *Id.* Officers then searched the Residence, using the set of house keys that Defendant dropped to enter the Residence. *Id.* They also used the safe key to open a safe located during a search. *Id.* The search revealed additional firearms, drugs, paperwork belonging to Defendant, and money. ECF No. 27 at 4.

3. **STANDARD OF REVIEW**

When reviewing a magistrate's recommendation, this Court is obliged to analyze de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id*. The Court's review encompasses both the magistrate's legal analysis and factual findings. *Id*.; *see also* Fed. R. Crim. P. 59(b).

4. **ANALYSIS**

Defendant moves to suppress the fruits of the March 2023 search and for a *Franks* hearing. ECF No. 27. He seeks suppression on the ground that the affidavit failed to establish both that Defendant lived at the Residence and that evidence of a crime would be found there. *Id.* at 4. He seeks a *Franks* hearing on the ground that Brooks both omitted material information from the affidavit and included material misrepresentations in it—specifically, that Ticcioni stated that Defendant "used keys" to open the rear door of the Residence and that Brooks corroborated this statement by viewing the video. *Id.* at 10.

**4.1 Motion to Suppress**

**4.1.1 Law**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause . . . ." U.S. CONST. amend. IV. "When an affidavit is the only evidence presented to a judge in support of a search warrant, the validity of the warrant rests solely on the strength of the affidavit." *United States v. McMillian*, 786 F.3d 630, 639 (7th Cir. 2015) (quoting *United States v. Peck*, 317 F.3d 754, 755 (7th Cir. 2003)).

"To determine whether probable cause existed, the court must ask whether, 'based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime.'" *Id.* (quoting *Peck*, 317 F.3d at 756). And not just any crime—an affidavit establishes probable cause to support a search warrant when it "sets forth sufficient evidence to convince a reasonable person that a search will uncover evidence of the *alleged crime*." *United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir. 2009) (citing *United States v. Carmel*, 548 F.3d 571, 575 (7th Cir. 2008) (emphasis added)).

Said otherwise, the probable cause inquiry asks whether the affidavit "presents a total set of circumstances creating a 'fair probability' that evidence of a crime will be found" specifically in the place to be searched. *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983) and *United States v. Bradford*, 905 F.3d 497, 503 (7th Cir. 2018)). "[T]he probable-cause standard is . . . a 'practical, nontechnical conception.'" *Gates*, 462 U.S. at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). It requires "more than mere suspicion, but does not require certainty." *United States v. Ellery*, 678 F.2d 674, 677 (7th Cir. 1982) (quoting *United States v. Anton*, 633 F.2d 1252, 1254 (7th Cir. 1980), *cert. denied*, 449 U.S. 1084 (1981)).

"[F]or a search warrant, probable cause 'does not require direct evidence linking a crime to a particular place.'" *Zamudio*, 909 F.3d at 175 (quoting *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006) and citing *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010) and *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). "Rather, issuing judges may draw reasonable inferences about where evidence is likely to be found

based on the nature of the evidence and the offense." *Id.* (citing *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009) and *Lamon*, 930 F.2d at 1188).

On a motion to suppress, the court commissioner's "decision to issue a warrant 'is to be given considerable weight' and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, fails to allege specific facts and circumstances to allow the . . . reasonabl[e] conclu[sion] that the items sought to be seized are associated with the crime and located in the place indicated." *United States v. Koerth*, 312 F.3d 862, 866–67 (7th Cir. 2002) (quoting *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)).

### 4.1.2 Defendant's Arguments in Support of Motion to Suppress; Magistrate Judge Dries's Recommended Disposition

Defendant argues that the affidavit failed to establish probable cause that evidence of the alleged crime would be found at the Residence. ECF No. 27 at 4. He argues that the affidavit rested on the assumption, but failed to establish or even explicitly state, that Defendant lived at the Residence. *Id.* at 6 (citing *United States v. Harris*, 215 F. App'x 262, 272 (4th Cir. 2007)).

Specifically, Defendant argues that the informant's statement that Defendant lived in the area of 43rd Street and Good Hope "is entitled to no consideration in the probable cause analysis because the affidavit fails to provide the basis of the informant's knowledge." *Id.* at 6 (citing *United States v. Sanders*, 59 F.4th 232, 238 (6th Cir. 2023), *rev'd en banc*, 106 F.4th 455 (6th Cir. 2024) and *United States v. Gifford*, 727 F.3d 92, 100 (1st Cir. 2013)). Similarly, he contends that the affidavit asserts in only conclusory fashion that Defendant was in a relationship with Johnson (in whose name the Residence's utilities were listed) without explaining how he reached that

conclusion. *Id.* at 7 ("Brooks swears that he conducted a records check using MPD resources. But he doesn't explain what those resources were."). Defendant also challenges, as discussed further *infra* Section 4.2.2, the affidavit's assertion that Ticcioni stated that Defendant "used keys to open the rear door" of the Residence and its assertion that the video taken by Ticcioni corroborates that statement. *Id.* at 9; Ex. A ¶ 22. In any event, Defendant argues, "an individual's use of a key, on its own, does not establish probable cause that the individual resides at [that] residence." ECF No. 27 at 9 (citing *United States v. Grandberry*, 730 F.3d 968, 978–79 (9th Cir. 2013)).

Magistrate Judge Dries rejected these arguments. ECF No. 37 at 7–14. "The affidavit . . . does contain sufficient facts from which the issuing judge reasonably could infer that [Defendant's] connection to the [R]esidence was much more substantial than the single visit witnessed by . . . Ticcioni." *Id.* at 8–9 (footnote omitted). Magistrate Judge Dries concluded, as the Court discusses further *infra* Sections 4.2.3 and 4.2.4, that the video fairly allowed for the inference that Defendant used keys to enter the Residence such that Defendant had a connection to the Residence "of some kind of permanency." *Id.* at 9.

Magistrate Judge Dries also rejected Defendant's arguments regarding the weight to be afforded to the informant's statements. *Id.* at 10–12. He noted that the informant's statements that "the man they knew as Blessed went armed with a handgun, that Blessed drove a red BMW, and that the source had seen Blessed driving a silver sedan near 43rd and Good Hope within the last three days . . . all proved true." *Id.* at 10. Magistrate Judge Dries acknowledged that various factors undermined the informant's credibility—for example, the source "didn't explain why they

believed [Defendant] lived near 43rd and Good Hope." *Id.* at 11. Nevertheless, he concluded that the scales tipped in favor of the informant's credibility, concluding that "although there are a few reasons to question the source's statements, the source was able to provide detailed information that proved to be correct." *Id.* at 12.

Magistrate Judge Dries also rejected Defendant's assertion that Brooks improperly failed to specify in the affidavit which "Milwaukee Police Department resources" he reviewed to conclude that Johnson and Defendant were in a relationship. *Id.* ("[Brooks] did not need to disclose what those resources were or explain how those resources demonstrated Johnson and [Defendant] were dating.").

Lastly, Magistrate Judge Dries rejected Defendant's contention that the affidavit needed to establish that Defendant "'lived' at the . . . [R]esidence in a traditional sense." *Id.* at 13. "It's true that some of the cases [Defendant] relies on . . . turn on whether the defendant *lived* at a residence." *Id.* (citing *Granberry*, 730 F.3d 968). "But," Magistrate Judge Dries continued, "the analysis here is not so formal; it requires the police merely to have probable cause that evidence would be found somewhere, not that the suspect have a specific kind of relationship with the place to be searched." *Id.* In sum, Magistrate Judge Dries concluded that Defendant's

> apparent use of keys, the entry into the [R]esidence without assistance (keys or not), the fact that both cars associated with him were parked outside, the time of day, and the fact that it was the residence of someone romantically associated with him were more than enough for law enforcement to believe his visit to the [R]esidence was not that of a casual visitor but of someone who might be expected to leave evidence of his criminal activity in that location.

*Id.* at 14.

### 4.1.3   Defendant's Objections; Analysis

Defendant objects to Magistrate Judge Dries's conclusion that the affidavit demonstrated "a significant enough connection with the [R]esidence such that the police might reasonably expect to find evidence of illegal activity there." ECF No. 39 at 5 (quoting ECF No. 37 at 14). Defendant argues that the "Recommendation offers no legal support for the notion that a person's non-residing connection to a residence is 'significant enough' to establish probable cause that they would store firearms or firearm-related items at the residence." *Id.* at 6–7. He argues that "[t]hough the facts establish a connection [between Defendant and the Residence], they do not establish that there was a fair probability that [Defendant] would store contraband there." *Id.* at 8.

Defendant also objects that Magistrate Judge Dries "gave undue weight" to the informant's statement that "Blessed" lived near 43rd and Good Hope and maintains that the affidavit needed to set forth the basis of the informant's belief and knowledge. *Id.* at 8–9 (citing *Sanders*, 59 F.4th at 238 and *Gifford*, 727 F.3d at 100); *id.* at 9 ("Because the affidavit did not provide the basis of the informant's knowledge, it cannot factor into the probable cause analysis.").

Defendant also objects with respect to Magistrate Judge Dries's conclusion that Brooks did not need to specify what "Milwaukee Police Department resources" he used to conclude that Defendant and Johnson were in a relationship. *Id.* at 10–11. Defendant argues that Brook's vague reference to having relied on "Milwaukee Police Department resources" is insufficient. *Id.* at 11 (citing *United States v. Roach*, 582 F.3d 1192, 1203 (10th Cir. 2009); *United States v. Edwards*, No. 16-cr-159-pp, 2018 WL 4512447, at *2 (E.D. Wis. Oct. 10, 2017); and *United States v. Malik*, No. 19-cr-28, ECF No.

32 at 19 (E.D. Wis. Aug. 2, 2019)). The Court addresses each of these objections in turn, bearing in mind that it considers the matters subject to each objection "de novo." Fed. R. Crim. P. 59(b)(3).

### 4.1.3.1 Assertion Regarding Having Performed a "Records Check" Using "Milwaukee Police Department Resources" is Entitled to Little to No Weight

The Court begins with Defendant's objection that it was insufficient for Brooks—to support his claim that Defendant and Johnson were in a relationship—to merely claim to have performed a "records check" using unspecified "Milwaukee Police Department resources." ECF No. 39 at 10–11. The Government fails to respond specifically to this objection, and Magistrate Judge Dries rejected the objection tersely and without citation to legal authority.

The Court cannot so quickly and succinctly reject this objection. It seems inherently problematic for an affiant to purport to have relied on unspecified police department resources, at some unspecified time, as the basis for its assertion. Such a vague attribution of the basis of the affiant's knowledge leaves both the court commissioner assigned to review the affidavit and the court later tasked with taking up the motion to suppress completely unable to discern what those "resources" may have been and whether they were reliable. *See United States v. Schubert,* 528 F. App'x 613, 616 (7th Cir. 2013) ("An affidavit in support of a search warrant can rely on information from other officers or other hearsay *if sufficiently reliable.*" (emphasis added) (citing *United States v. Hollingsworth*, 495 F.3d 795, 805 (7th Cir. 2007); *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000); and *United States v. Spears,* 965 F.2d 262, 277 (7th Cir. 1992)). Were the

Case 2:24-cr-00002-JPS    Filed 11/22/24    Page 11 of 36    Document 42

"resources" statements from another unidentified informant? Did they consist of information relayed from another officer? Were they a collection of documents or reports? The Court has no way of knowing.

Similarly, it has no way of knowing if the information derived via a "records check" that took place at an unspecified time using unspecified police "resources" was recent or stale. *United States v. Prideaux-Wentz,* 543 F.3d 954, 959 (7th Cir. 2008) (concluding that search warrant was unsupported by probable cause because "the evidence relied on to obtain the warrant . . . was stale"). Brooks did not indicate in the affidavit how old the information in the "resources" was, nor did he indicate whether the "resources" are reviewed and updated on any regular basis such that they could be considered reliable. *See United States v. Williams,* No. 04-CR-273, 2005 U.S. Dist. LEXIS 46151, at *3–4 (E.D. Wis. Mar. 18, 2005) ("Your affiant did check the Racine Police Department records . . . . Your affiant believes this information as these records are updated on a daily basis.").

The argument could perhaps be made that since a court commissioner may, "[i]n determining whether probable cause exists, . . . regard an affiant's fellow law enforcement officers as reliable sources," *Spears,* 965 F.2d at 277 (citing *United States v. Griffin,* 827 F.2d 1108, 1112 (7th Cir. 1987), *cert. denied,* 485 U.S. 909 (1988) and *United States v. Pritchard,* 745 F.2d 1112, 1120 (7th Cir. 1984)), the court commissioner could similarly regard unspecified police department "resources" as inherently reliable merely by virtue of their law enforcement derivation. But the Court has located no authority explicitly supporting such an extension of law and, at bottom, an affidavit "must provide the magistrate with a *substantial* basis for determining the existence of probable cause" such that the court commissioner's action is not "a mere ratification of the bare conclusion of

others." *Gates*, 462 U.S. at 239 (emphasis added). Paragraph 16 of the affidavit—asserting that Brooks "conducted a records check using Milwaukee Police Department resources and determined [that] . . . Johnson is the girlfriend of [Defendant]" is too vague and unspecific—both in nature and time—for any reviewing court to determine whether or to what extent it supported a finding of probable cause. Defendant's objection on this point is accordingly well taken, and the Court omits that assertion in paragraph 16 of the affidavit in its holistic determination of whether the affidavit established probable cause to search the Residence.

### 4.1.3.2 The Confidential Informant's Statements are Entitled to Minimal Weight

The Court next addresses Defendant's objections regarding the weight to be afforded to the informant's statements. ECF No. 39 at 8–10. "[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report." *Gates*, 462 U.S. at 230. Each is a "relevant consideration[] in the totality-of-the-circumstances analysis . . . . a deficiency in one may be compensated for . . . by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233 (citing *Adams v. Williams*, 407 U.S. 143, 146–47 (1972) and *Harris v. United States*, 403 U.S. 573 (1971)).

"For evaluating the totality of the circumstances in informant cases, [the Seventh Circuit's] decisions have developed five primary factors that we consider along with other pertinent concerns: the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate." *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014) (citing *United States v. Johnson*, 655

F.3d 594, 600 (7th Cir. 2011)). "In general, 'no one factor necessarily dooms a search warrant.'" *Id.* (citing *Johnson*, 655 F.3d at 600); *see also Bell*, 585 F.3d at 1049 ("No one factor is dispositive, so a deficiency in some areas can be compensated by a stronger showing in others." (citing *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006))). However, "information about the informant's credibility or potential bias is crucial," and a "complete omission of information regarding [a confidential informant's] credibility is insurmountable." *Glover*, 755 F.3d at 816.

The affidavit in this case represented that the informant was "reliable" and "credible" because the informant had "given law enforcement officers information which resulted in over 12 search warrants that directly led to the arrest of over 24 individuals in the City of Milwaukee." Ex. A ¶¶ 6, 9. These paragraphs help establish the informant's reliability and support a finding of probable cause. *See Bell,* 585 F.3d at 1050 ("[T]he affidavit fails to provide any information to establish [the informant's] reliability," in part because it "did not indicate whether the [informant] had provided information to law enforcement in the past" (citing *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006))).

Also relevant is the "degree of corroboration" that police performed to confirm the informant's statements. *Glover*, 755 F.3d at 816. This factor is important; Supreme Court "decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Gates*, 462 U.S. at 241.

Brooks swore in the affidavit that he "was able to corroborate some, if not all, of the confidential informant's assertions . . . by means of [Brooks's] personal knowledge along with information supplied to affiant

by other unrelated and independent sources of information." Ex. A ¶ 8. This assertion is vague and essentially worthless. It leaves the Court unable to determine which of the informant's assertions were independently corroborated.[4] The Court is tasked with considering the "degree of corroboration," but it cannot do so when the affiant himself is apparently unsure as to whether he corroborated only "some" of the informant's assertions, or instead "all" of them. *Glover*, 755 F.3d at 816; Ex. A ¶ 8. If anyone should know how many of the informant's statements the affiant corroborated, it should be the affiant himself.

As with Brooks's reference to "Milwaukee Police Department resources," the Court has no way of knowing what "other unrelated and independent sources of information" encompasses. Ex. A ¶ 8. This matters because the Seventh Circuit has held, for example, that corroboration through a mere "search of the defendant's record" is typically insufficient. *Glover*, 755 F.3d at 816; *id.* at 817 ("The police confirmed only minor facts and legal conduct."); *Bell*, 585 F.3d at 1053 ("Our primary concerns were the lack of specific detail in the affidavit and the police's failure to corroborate the informant's statement beyond a mere criminal record check." (citing

---

[4]Much of the corroboration that Brooks specifically references in the affidavit of having personally performed goes to entirely innocuous behavior on the part of Defendant. For example, he swears that he checked the registration of the red BMW and that he confirmed that "Blessed" was Defendant by showing the informant a recent booking photo of Defendant. Ex. A ¶ 14, 18. *See United States v. Dismuke*, 593 F.3d 582, 587 (7th Cir. 2010) ("[The affiant] did make some effort to corroborate the informant's information. He asked the informant to identify [the defendant] from a photograph, and the informant correctly did so."). These efforts by Brooks "corroborated only [the defendant's] identity and" the registration of the car he occasionally drove. *Dismuke*, 593 F.3d at 587–88. "Accuracy on these innocent facts is important but does not directly bolster the informant's claim that [the defendant] illegally possessed guns . . . ." *Id.* at 588.

*Peck*, 317 F.3d at 757)). *Glover* and *Bell* demonstrate that both the means by which police corroborate an informant's statements as well as which specific statements they corroborate matters. In *Bell*, the Seventh Circuit concluded that the affidavit's conclusory statement that "several unidentified arrestees and 'confidential sources' also implicated [the defendant] as someone who was actively involved in the sale of crack cocaine" provided "[in]sufficient corroboration." 585 F.3d at 1050 (citing *Taylor*, 471 F.3d at 840). That conclusory statement is arguably even more specific than Brooks's representation that he was "able to corroborate some, if not all, of the confidential informant's assertions . . . by means of [Brooks's] personal knowledge along with information supplied . . . by other unrelated and independent sources of information." Ex. A ¶ 8.

All that said, Ticcioni's observations and video nevertheless corroborated several of the informant's statements, including that "Blessed" went out armed, that "Blessed" was a Black male in his mid 20s, that he lived (or at least had some not insignificant connection to a residence) in the area of N. 43rd and W. Good Hope Rd., and that he sometimes drove a silver sedan. Ex. A ¶¶ 14, 20, 21, 24, 25. Given that corroboration, the Court is satisfied that the "degree of corroboration" supports the overall veracity of the informant's statements.

The Court next addresses "the level of detail" in the informant's statements. *Glover*, 755 F.3d at 816. Again, the informant told officers that an individual that the informant knew only as "Blessed" tried to give the informant a sample of crack-cocaine in the area of 7000 W. Brown Deer Rd., on which occasion "Blessed" was armed with a handgun. Ex. A ¶¶ 11, 14. The informant also told officers that "Blessed" was a Black male; that he was approximately 25 years old; that he would sell one gram of crack

Case 2:24-cr-00002-JPS    Filed 11/22/24    Page 16 of 36    Document 42

cocaine for $60.00; that he lived somewhere around N. 43rd and W. Good Hope Rd.; and that he drove both a red BMW with Wisconsin plates and a silver sedan. *Id.* ¶¶ 12, 14, 25. Magistrate Judge Dries concluded that "the source was able to provide detailed information," ECF No. 37 at 12, but the Court would not characterize it as such.

It is important to remember, in analyzing "the level of detail" in the informant's statements, the specific offense on which the warrant was focused. *See Glover*, 755 F.3d at 817 ("Doe's generic allegations of T.Y.'s gang activity are not problematic on their own. (The warrant was focused on the firearms alone, not any other crimes.).").  The warrant in this case, as in *Glover*, focused solely on firearms. It did not seek to uncover drug related activity. The Court therefore focuses primarily on the "level of detail" in the informant's statements specifically regarding Defendant's alleged possession of a firearm or firearms. Adjusting that lens accordingly, the Court concludes that "[t]he amount of detail in the affidavit . . . leaves much to be desired." *Bell*, 585 F.3d at 1050.

The informant told police that "Blessed" was armed with a handgun when "Blessed" approached him in the area of 7000 W. Brown Deer Rd. Ex. A ¶¶ 11, 14. Unlike in *Glover*, the informant did not specifically describe the firearm. 755 F.3d at 817 (citing *Dismuke*, 593 F.3d 582); *see also United States v. Jones*, 376 F. App'x 627, 628 (7th Cir. 2010) (noting as relevant to probable cause finding that affiant swore that "a confidential informant with extensive knowledge of different types of firearms had seen [the defendant] armed with a black, semi-automatic pistol").

However, the lack of detail as to the firearm is immaterial in this case. As a convicted felon, Defendant could not possess *any* firearm, irrespective of kind—"[h]ere, the mere possession of a firearm is all that is required to

establish the commission of the offense." *United States v. Searcy*, 664 F.3d 1119, 1123 (7th Cir. 2011) ("In *Bell* and *Peck*, . . . the contraband in question consisted of drugs that are easily mistaken for other, legal substances. The same is not true of firearms.").

The informant also did not know Defendant's real name or his specific address. *See Jones*, 376 F. App'x at 628 (noting as relevant to probable cause finding that informant "knew [the defendant's] name [and] his exact address"). Further, the informant described "Blessed" only as a Black male of approximately 25 years of age; he provided no further details going to physical appearance, height, or body type—details one would expect the informant to be able to provide since the informant claimed to have had an in-person interaction with "Blessed," apparently at a close enough proximity for the informant to discern that "Blessed" was armed. Ex. A ¶ 12; *Peck*, 317 F.3d at 756 ("[The informant] was unable to give any information regarding [the defendant] other than that he was a black male." (citing *United States v. Jones*, 208 F.3d 603, 605–06 (7th Cir. 2000)); *but see United States v. Orr*, 969 F.3d 732, 737 (7th Cir. 2020) ("Although the [informant] first described [the suspect] only as a Black male, that description is not problematic because [the informant] later identified [the suspect] with a picture of [the suspect] from a law enforcement database.").

While "[p]recedent does not require a confidential informant to provide officers with every detail of illicit conduct," *Orr*, 969 F.3d at 737 (citing *United States v. Garcia*, 528 F.3d 481, 485–86 (7th Cir. 2008)), the informant's statement here lacked several fairly basic details. This factor accordingly does not support a finding of probable cause. That said, "given the fact that the informant's previous dealings with the police had led to" the arrests of 24 individuals in the City of Milwaukee, "the informant's

information" may be considered "sufficiently reliable to compensate for its lack of detail." *Searcy,* 664 F.3d at 1123 (citing *Koerth,* 312 F.3d at 871); Ex. A ¶ 9.

Also relevant is "the time between the events reported [by the informant] and the warrant application." *Glover,* 755 F.3d at 816. Consideration of this factor undermines the degree to which the informant's statements support a finding of probable cause. While the affidavit represents that officers "received information" from the informant in December 2022 regarding "Blessed" having approached the informant while armed to offer him a sample of crack cocaine, the affidavit does not clarify whether that underlying event occurred that same month or at some time in the past. Ex. A ¶ 11; *see also id.* ¶ 14 (Brooks swearing that informant told him that "Blessed" was armed with a handgun when "Blessed" approached the informant, but not specifying when that event occurred). Nowhere does the affidavit specify—or even assert generally—when "Blessed" allegedly approached the informant while armed to offer him crack cocaine.[5]

Similarly, the affidavit later states that Brooks "was informed by the [informant] within the last three days that the [informant] observed

---

[5]Magistrate Judge Dries found this factor to tip in favor of the informant's reliability, writing that "most of the source's information was recent." ECF No. 37 at 12 ("[T]he source told the police they had information about [Defendant] in December 2022, the source met with Officer Brooks in early February 2023, and the source told Brooks they'd seen [Defendant] driving a silver sedan near 43rd and Good Hope just a few days before Brooks applied for the warrant . . . ."). The Court disagrees. Though the informant relayed information to police in December 2022, February 2023, and just a few days before Brooks applied for the warrant, that does not mean that the information itself "was recent." To the contrary, the affidavit makes no indication as to when the informant experienced the events that he or she later relayed to police; it states only when police *received* the information.

[Defendant] driving a silver sedan in the area of N. 43rd St. and W. Good Hope Rd., and that [Defendant] also drives a red BMW." Ex. A. ¶ 25. That paragraph specifies when Brooks learned that information from the informant, but it does not state when the informant allegedly saw Defendant driving in that area. In other words, while these attestations were "obtained through firsthand observation" on the part of the informant, *Searcy*, 644 F.3d at 1122, there is no information in the affidavit whatsoever from which to determine when the informant allegedly interacted with "Blessed" and later saw him driving. For all the Court knows, the informant could have had that interaction with "Blessed" years ago, making it stale information. This factor accordingly undermines the degree to which the informant's statements support a probable cause finding.

The Court must additionally consider the "basis of [the informant's] knowledge." *Glover*, 755 F.3d at 816. Obviously, with respect to the informant's statements that he was approached by "Blessed" and that he witnessed "Blessed" driving, "the 'basis of knowledge' prong is satisfied by [the informant's] statement that he personally observed the . . . activity . . . ." *Gates*, 462 U.S. at 268 n.20 (White, J., concurring in the judgment). The informant did not allege, however, that he knew from personal observation that Defendant lived in the area of N. 43rd and W. Good Hope Rd. Ex. A ¶ 14. The affidavit does not provide "the particular means by which [the informant] came by the information" on this point. *Gates*, 462 U.S. at 228. That is very problematic given the warrant's focus on that Residence. Did the informant merely see "Blessed" driving around that area frequently enough that the informant assumed that "Blessed" lived there? Did someone tell the informant that "Blessed" lived in that area? The Court has

no way of knowing. It can accordingly lend little credence to the informant's statement that Defendant lived in the area of N. 43rd and W. Good Hope Rd.

Lastly, it does not appear that the informant "appear[ed] before the [court commissioner], which would have given the [commissioner] an opportunity to assess his credibility." *Bell*, 585 F.3d at 1050 (citing *United States v. Sims*, 551 F.3d 640, 645 (7th Cir. 2008)). This, too, undermines a finding of probable cause.

Having analyzed each of the relevant factors, the Court must conclude that the affidavit in this case—specifically to the extent that it relied on the confidential informant's statements—suffered from serious deficiencies. It was relatively undetailed. It entirely failed to specify "the time between the events reported [by the informant] and the warrant application." *Glover*, 755 F.3d at 816 (citation omitted). The informant's statements were only partially corroborated. The informant was unidentified and did not appear before the court commissioner. Nor did the affidavit specify the informant's basis of knowledge for the informant's statement regarding where Defendant lived. While a deficiency in one factor may be compensated for by other indicia of reliability, *id.*, there are simply too many deficiencies here to overcome. Holistically analyzed, the Court concludes that the confidential informant's statements were insufficient by themselves to provide probable cause for the search of the Residence and that they carry only minimal weight in the overall probable cause analysis.

Case 2:24-cr-00002-JPS    Filed 11/22/24    Page 21 of 36    Document 42

### 4.1.3.3 The Affidavit Does Not Support a Finding of Probable Cause to Search the Residence

Having addressed Defendant's specific objections regarding deficiencies in the affidavit and with the confidential informant's statements, the Court must now consider whether the totality of the circumstances nevertheless support a finding of probable cause to believe that evidence of the alleged crime—possession of a firearm by a felon—would be found in the Residence. The Court undertakes this analysis having concluded *supra* Section 4.1.3.1 that it should omit from this analysis Brooks's statement that Defendant and Johnson were in a relationship, Ex. A ¶ 16, and having concluded *supra* Section 4.1.3.2 that the confidential informant's statements carry minimal weight.

A threshold question is: what other information remains in the affidavit from which a probable cause finding can be drawn? The most damning component of the affidavit is Ticcioni's personal observation and video recording of Defendant parking behind the Residence, exiting his vehicle while holding a firearm, and entering through the rear door of the Residence, all just three days before Brooks applied for the search warrant. Ex. A ¶¶ 20–23. The Court concludes *infra* Section 4.2.4 that a reasonable viewer of the video could infer that Defendant used keys to open the door.

The ultimate question is whether the information in the affidavit—subject to the considerations discussed *supra* Sections 4.1.3.1 and 4.1.3.2—sufficiently allows for the common sense inference that evidence of the offense of possession of a firearm by a felon would be found in the Residence at the time of the search. Although it is a relatively close case, the Court declines to adopt Magistrate Judge Dries's recommendation on this point and answers that inquiry in the negative.

Defendant was seen entering the Residence, with keys (although it is not entirely clear whether he used them to enter the Residence),[6] on a single occasion while armed. Ex. A ¶¶ 21–23. There is no indication in the affidavit as to how long he stayed there. *See United States v. Knox*, 79 F. Supp. 3d 1219, 1229 (D. Kan. 2015) ("[T]he affidavit indicates only that Defendant was present in the apartment at some point on February 3, 2014, and then again on February 6, 2014. As far as the Court can discern from the affidavit, these might have been isolated visits lasting only a couple of hours each.").

An undisclosed informant told police that Defendant lived in that general area, but he was not specific, and he apparently did not disclose how he knew the general area in which Defendant lived. Ex. A ¶ 14. Another vehicle that the informant claimed to have seen Defendant driving in the past was also parked at the Residence on the occasion when Defendant was seen entering the Residence, but that vehicle wasn't registered in Defendant's name. *Id.* ¶¶ 12; Ex. B.

Nor were the utilities to the Residence in Defendant's name. Ex. A ¶ 17; *United States v. Gregory*, 795 F.3d 735, 741 (7th Cir. 2015) ("[Law enforcement] corroborated that [the defendants were listed on the electrical utility accounts for the . . . residences, which verified the basic assertion that they lived there."). Brooks did not indicate in the affidavit that any other utility or service—internet, phone, cable, etc.—connected to the Residence was in Defendant's name. *See United States v. Johnson*, 867 F.3d 737, 742 (7th Cir. 2017) (noting that a "parking ticket" issued outside the location to be

---

[6] Magistrate Judge Dries acknowledges that "the fact that [Defendant] appeared to use keys to enter the residence does not conclusively prove [that] he lived there," but nevertheless believed that the use of keys "is suggestive of some kind of permanency, which means he might very well keep evidence relating to the crime . . . on the premises." ECF No. 37 at 9.

searched, although of "very limited significance," helped to "show [the defendant's] association with the location"); *see also Anderson,* 450 F.3d at 303 (noting as relevant to probable cause finding that "probation records, post office records, energy company records, and the management of the apartment complex all confirmed that [the defendant] lived at the Milwaukee address specified in the warrant application"). And no one—police or the informant—claimed to have seen Defendant at the Residence on any other occasion, with a firearm or otherwise. There was, in other words, very little set forth in the affidavit specifically connecting Defendant to the Residence, let alone establishing that Defendant had a significant enough connection to it that he would keep firearms there.

The Court finds a comparison with *United States v. Yarber* illustrative. In that case, law enforcement began investigating the defendant after learning from a confidential source that the defendant was selling drugs in the Champaign-Urbana area. 915 F.3d 1103, 1104 (7th Cir. 2019). The source bought drugs from the defendant on four separate occasions, always near the same intersection in Champaign. *Id.* Police observed the defendant on each of those four occasions driving a white Dodge Charger, which was registered to the defendant's girlfriend. *Id.* Immediately following two of the buys, the defendant drove to his girlfriend's apartment in Champaign. *Id.* Police surveilled the apartment on three additional occasions, and on all three occasions saw the white Dodge Charger parked in front. On one occasion, they saw the defendant exit the Dodge Charger and go inside the apartment. *Id.*

The Seventh Circuit affirmed the district court's denial of a motion to suppress. *Id.* The Seventh Circuit concluded that "[w]hile the warrant affidavit fell short in one respect—it did not establish that [the defendant]

lived at the apartment and thus could not support an inference that evidence of his drug-dealing would be kept there—it nonetheless contained other facts sufficient to establish probable cause." *Id.* at 1104.

> Yarber used his girlfriend's white Dodge Charger for each of the four controlled buys. Surveillance also established that the Dodge Charger was parked outside the apartment on three occasions, and that Yarber exited the car and entered the apartment on one of those occasions. Finally—and most significantly—Yarber drove directly to the apartment after two of the four controlled buys. This was sufficient to search the apartment for the proceeds of those transactions. The Champaign County judge was entitled to draw the reasonable inference that an experienced drug dealer might maintain cash proceeds from drug sales within the apartment he visited immediately after the sales—an apartment rented to his girlfriend and tied to the car he used to conduct his drug sales—rather than on his person or in a car.

*Id.* at 1105–06.

Here, the warrant both failed to "establish that [Defendant] lived at the [Residence]" and also failed to otherwise establish probable cause that evidence of his firearm possession would be found there at the time of the search. *Id.* at 1104. The probable cause analysis in *Yarber*—which the Seventh Circuit described as being "far from open and shut"—involved far more indicia connecting the defendant and his criminal activity to the residence to be searched. *Id.* at 1105. If that probable cause analysis was "far from open and shut," then that in this case is even more so. *Id.* The defendant in *Yarber* was seen using his girlfriend's vehicle—specifically to conduct his criminal activity—on four occasions, and he was seen driving in that vehicle directly from the buys to his girlfriend's apartment on two occasions. Meanwhile, in the instant case, Defendant was seen at the Residence on just a single occasion, and he did not, on that occasion, even

drive Johnson's red BMW. Moreover, having omitted paragraph 16 of the affidavit from its consideration, *see supra* Section 4.1.3.1, nothing in the affidavit establishes or even suggests that Defendant and Johnson were in a relationship. For all Ticcioni or Brooks knew, Defendant could have been house sitting.

Considered holistically, the affidavit at best supports a "mere suspicion" that evidence of the crime alleged would be found at the Residence. *Ellery*, 678 F.2d at 677 (citations omitted). But that is not enough. The Court is unable to conclude that the court commissioner in this case "had a 'substantial basis for concluding' that probable cause existed." *Koerth*, 312 F.3d at 866 (quoting *Gates*, 462 U.S. at 238). There was simply too little set forth in the affidavit specifically connecting Defendant's firearm possession with the Residence. For all these reasons, the Court overrules Magistrate Judge Dries's findings and conclusions—to the extent they differ with those discussed herein—with respect to whether the affidavit contained sufficient information to allow for the reasonable inference that evidence would be found in the Residence.

### 4.1.3.4 Good Faith Exception

The Court's conclusion that the affidavit did not supply probable cause to search the Residence is not the end of the story, however. "[T]he suppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing [court commissioner's] finding of probable cause." *Searcy*, 664 F.3d at 1124 (citing *United States v. Leon*, 468 U.S. 897, 920–24 (1984)). "The good faith exception prevents operation of the exclusionary rule if the police officer's reliance on a search warrant was objectively reasonable." *Glover*, 755 F.3d at 818 (citing *Leon*, 468 U.S. at 922–

23). "An officer's decision to obtain a warrant is prima facie evidence that he or she was acting in good faith." *Searcy*, 664 F.3d at 1124 (citing *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007)). "A defendant can rebut the presumption of good faith only by showing (1) that the issuing [court commissioner] abandoned his or her detached and neutral role, (2) the officers were dishonest or reckless in preparing the affidavit, or (3) the warrant was so lacking in probable cause as to render the officer's belief in its existence entirely unreasonable." *Id.* (citing *Otero*, 495 F.3d at 398).

Magistrate Judge Dries concluded that even if the affidavit in support of the search warrant application failed to provide probable cause to search, the good faith exception nevertheless likely applied:

> There's no evidence that the issuing judge here abandoned his neutral, detached role. Officer Brooks did not intentionally or recklessly mislead the issuing judge. The affidavit wasn't so bare bones that the executing officers' reliance on it was unreasonable. And the warrant itself wasn't facially deficient. Thus, even if the search warrant failed to state probable cause, the evidence recovered from the . . . [R]esidence should not be suppressed, as the officers relied on the warrant in good faith.

ECF No. 37 at 23. Defendant objects to this conclusion solely based on his argument in support of his motion for a *Franks* hearing that Brooks knowingly and intentionally, or with reckless disregard for the truth, materially misrepresented information in the affidavit and omitted material information from the affidavit. ECF No. 39 at 11.[7] The Court rejects that

---

[7]Defendant does not argue that the court commissioner "abandoned his or her detached and neutral role" or that the warrant was "so lacking in probable cause as to render the officer's belief in its existence entirely unreasonable," *Searcy*, 664 F.3d at 1124, and he does not object to Magistrate Judge Dries's conclusion that those circumstances have not been demonstrated here. The Court accordingly discusses those aspects of the good faith exception no further.

argument *infra* Section 4.2.4, so it cannot save him here. The Court agrees with Magistrate Judge Dries regarding the applicability of the good faith exception, so it will adopt that portion of his recommendation and overrule Defendant's objection on this point. Accordingly, and notwithstanding the Court's conclusion that probable cause was lacking, the Court must deny Defendant's motion to suppress.

### 4.2 Motion for *Franks* Hearing

#### 4.2.1 Law

 "Affidavits and complaints supporting warrants are presumed valid." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009). But "[i]n *Franks v. Delaware*, the United States Supreme Court held that under limited circumstances a defendant may be entitled to a hearing to challenge the truth of statements made in a search warrant affidavit." *Carmel*, 548 F.3d at 577 (citing *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003)).

To rebut the presumption of validity, "a defendant must make a substantial preliminary showing that the complainant made 'a false statement knowingly and intentionally, or with reckless disregard for the truth.'" *Johnson*, 580 F.3d at 670 (quoting *Franks*, 438 U.S. at 155). "[T]he evidence must show that the officer submitting the complaint perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the allegations." *Id.* (citing *Jones*, 208 F.3d at 607 and *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984)). Alternatively, a defendant may seek a *Franks* hearing on the ground that "the affiant intentionally or recklessly *omitted* material information." *Carmel*, 548 F.3d at 577 (quoting *United States v. Hoffman*, 519 F.3d 672, 675 (2008)). "[T]he defendant must offer direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had a subjective intent to deceive

based on the nature of the omissions." *Glover*, 755 F.3d at 820 (citing *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990) and *United States v. A Residence Located at 218 Third Street*, 805 F.2d 256, 258 (7th Cir. 1986)).

In either case, the defendant must also demonstrate materiality; "if probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required." *Carmel*, 548 F.3d at 577 (citing *Souffront*, 338 F.3d at 822). Said otherwise, the defendant must demonstrate that the false statements or omissions "would alter the probable cause determination." *United States v. Woodfork*, 999 F.3d 511, 516 (7th Cir. 2021) (quoting *Glover*, 755 F.3d at 820 and citing *United States v. Bell*, 925 F.3d 362, 372 (7th Cir. 2019)). "*Franks* hearings are 'rarely held' because '[t]hese elements are hard to prove.'" *Woodfork*, 999 F.2d at 516 (quoting *United States v. Dessart*, 823 F.3d 395, 302 (7th Cir. 2016)).

If the defendant meets his burden, "the court will set aside th[e] 'false material' contained in the warrant affidavit, and if probable cause cannot be established from the valid and truthful portion of the affidavit, the entire search warrant is deemed to be invalid and the ensuing search is void." *United States v. McDonald*, 723 F.2d 1288, 1292 (7th Cir. 1983) (quoting *Franks*, 438 U.S. at 155–56).

### 4.2.2 Defendant's Arguments in Support of Motion for *Franks* Hearing; Magistrate Judge Dries's Recommended Disposition

Defendant argues that Brooks's affidavit included both false statements and omissions. ECF No. 27 at 12. Defendant first argues that Brooks falsely swore both "that Ticcioni stated that the driver of the Altima . . . 'used keys to open the rear door' to the [R]esidence and that Ticcioni's

video corroborated [that] statement." *Id.* (citing Ex. A ¶¶ 22, 24). These averments are false, Defendant argues, because "[n]either Ticcioni nor the camera were in a position to see how the driver opened the door." *Id.* With respect to the alleged omissions, Defendant argues that the affidavit materially omitted "information that [Defendant] lived elsewhere"—specifically, that a publicly accessible paternity action docket from 2022 listed a different address for Defendant than that of the Residence. *Id.* (citing *In re the Paternity of K.A.B.*, No. 2022PA002721PJ (Milwaukee Cnty. Cir. Ct.), *available* *at* https://wcca.wicourts.gov/caseDetail.html?caseNo=2022PA002721PJ&countyNo=40. Defendant argues that the affidavit also omitted "any information about the informant's criminal history or reason for cooperating with law enforcement," which information Defendant argues is "essential to a proper probable cause analysis." *Id.* at 13 (quoting *United States v. Clark*, 935 F.3d 558, 573 (7th Cir. 2019) (Scudder, J., dissenting in part) and citing *Glover*, 755 F.3d at 817 and *United States v. Musgraves*, 831 F.3d 454 (7th Cir 2016)).

### 4.2.3 Magistrate Judge Dries's Conclusions

Magistrate Judge Dries concluded that Defendant "failed to make a substantial preliminary showing warranting a *Franks* hearing." ECF No. 37 at 16. He concluded that there were no false statements or misleading omissions in the affidavit. *Id.* at 16–20.

With respect to Defendant's contention that Brooks falsely swore that Ticcioni stated that Defendant "used keys" to enter the Residence, Magistrate Judge Dries concluded that "it is a hair-splitting point of questionable relevance" whether Ticcioni said that Defendant entered the Residence "with keys" or "used keys." *Id.* "[I]t's clear . . . [that] [Defendant]

entered the door with keys in his hand, and, given the obstructed view shown in the video, Ticcioni was entitled to make the common-sense assumption that [Defendant] *used* the keys to enter the door." *Id.*

Magistrate Judge Dries also rejected Defendant's contention that Brooks falsely stated that the video corroborated Ticcioni's statement. *Id.* (citing Ex. A ¶ 24). "My viewing of the video convinces me that [Defendant] did use keys to unlock the rear door, or at least that it would have been extremely reasonable to assume that he did." *Id.* As Magistrate Judge Dries saw it, the video depicts Defendant "carr[ying] the keys to the door in his left hand, as if planning to use them to open the door," and it "d[id] not appear that anyone let him inside the [R]esidence." *Id.* at 17 (citing Ex. B). "The video thus 'corroborates' the proposition that [Defendant] used keys to open the door even if it does not explicitly show him doing so." *Id.*

With respect to the alleged omissions, Magistrate Judge Dries concluded that Defendant "failed to demonstrate that . . . Brooks intentionally omitted material information." *Id.* at 18. Defendant argued that Brooks omitted reference to the Milwaukee County paternity action docket which listed Defendant's address as one other than that of the Residence, but Defendant "merely speculates that Brooks was aware of the paternity case." *Id.* at 18–19. Magistrate Judge Dries noted that while Brooks averred to have consulted "internal police records," he never claimed to have reviewed "public court records," so it was not clear that Brooks even knew about the paternity case. *Id.* at 19. And with respect to the alleged omission of information as to the informant's criminal history and motive for cooperating with police, Magistrate Judge Dries noted that Defendant failed to suggest that the informant even had any criminal history that could have been included in the affidavit. *Id.* at 20.

Magistrate Judge Dries went on to conclude that Defendant failed to demonstrate that the alleged false statements and misleading omissions were material. *Id.* at 20–22. He concluded that if the clause regarding Defendant's entry of the Residence with keys were omitted, "the affidavit would still contain enough facts to induce a reasonably prudent person to believe that a search of the . . . [R]esidence would uncover evidence of a crime." *Id.* at 20. Similarly, Magistrate Judge Dries concluded that "[t]he affidavit . . . would still have supplied probable cause . . . [even] if . . . Brooks had disclosed the paternity action." *Id.* at 21. He reasoned that, while the docket for that action listed a different address for Defendant, it was over a year old by the time Brooks applied for the warrant, so it would not defy common sense to believe that Defendant could have moved in the intervening period. *Id.* Moreover, Magistrate Judge Dries emphasized, Brooks still had the informant's statement that Defendant lived near 43rd and Good Hope, as well as Ticcioni's statement and video showing Defendant entering the Residence. *Id.*

Nor did Magistrate Judge Dries consider any omission regarding the informant's criminal history or motivation for cooperating with police to be material. *Id.* at 21–22. At bottom, "[t]he warrant . . . sought evidence related to [Defendant's] unlawful possession of a firearm—a crime that . . . Ticcioni witnessed firsthand (and caught on camera)" completely independently from the informant's involvement. *Id.* at 22.

### 4.2.4    Defendant's Objections; Analysis

Defendant objects to these conclusions recounted *supra* Section 4.2.3. ECF No. 39 at 5–6. The Court addresses each in turn.

First, the Court addresses Defendant's argument, ECF No. 39 at 5, that it was false for Brooks to swear that Ticcioni "stated [that] the driver

. . . used keys" to open the rear door when Ticcioni in fact stated that the driver "enter[ed] the rear door . . . with keys." ECF No. 39-1 at 1; Ex. A ¶ 22. The Court agrees with Magistrate Judge Dries that this distinction is essentially splitting hairs, ECF No. 37 at 16, so it will overrule Defendant's objection on this point.

Certainly, one could interpret the statement "the person entered the door with keys" as meaning simply that the person entered the door while holding keys. But the alternative—that a person who enters a residence "with keys" is understood as having utilized the keys to enter the residence—is as reasonable, if not more reasonable, of an interpretation. It would have been entirely reasonable for Brooks to understand Ticcioni's statement that Defendant "enter[ed] the rear door . . . with keys" as meaning that Defendant in fact used the keys in his hand to open the door. The Court cannot, therefore, conclude that Brooks included a falsehood in the affidavit when he swore that Ticcioni stated that Defendant "used keys to open the rear door." Ex. A ¶ 22.

The Court next addresses Defendant's argument that it was false for Brooks to swear that his viewing of the video corroborated Ticcioni's statement that Defendant "used keys" to enter the Residence. ECF No. 39 at 5; Ex. A ¶ 24. Defendant objects to Magistrate Judge Dries's conclusion that the video allows for the commonsense assumption that Defendant used keys to enter the Residence such that it was not false for Brooks to swear that the video corroborated that proposition. ECF No. 39 at 11–13.

The Court has reviewed the video demonstrating Defendant's approach to and entrance into the Residence. All parties and Magistrate Judge Dries appear to agree that while the video depicts Defendant

approaching the Residence with keys in hand, it does not show whether the keys were then used to open the door because the view is obstructed.

However, as Magistrate Judge Dries notes, Defendant pauses for several seconds upon reaching the door before opening it. ECF No. 37 at 17; Ex. B. Based on that pause, the fact that Defendant appears to have held onto the keys as he approached the door rather than putting them back in his pocket, and the fact that the video does not appear to show anyone opening the door for him, it was reasonable for Brooks to infer that Defendant did in fact use the keys he held in his hand to open the door.

Certainly, the video does not definitively show Defendant utilizing the keys to enter the Residence, and the sound of the honk when Defendant reached the door may support the proposition that Defendant held onto the keys merely to remotely lock the vehicle. But the Court nevertheless agrees with Magistrate Judge Dries that a reasonable viewer of the video could infer that Defendant additionally used the keys to open the rear door of the Residence. That being the case, the Court cannot conclude that it was false for Brooks to swear that his viewing of the video "corroborated . . . Ticcioni's statement." Ex. A ¶ 24; *United States v. Wellington*, No. 1:22-cr-540, 2023 U.S. Dist. LEXIS 53183, at *13–14 (N.D. Ohio Mar. 28, 2023) (denying motion for *Franks* hearing and noting that "[a]fter viewing the . . . music video, it is unclear whether there is a window in a room. The video's shifting camera angles, short clips, and fluctuating lighting make it difficult to ascertain this specific detail. Even so, the affiant's statements were a reasonable interpretation of what he believed the . . . music video showed." (citing *United States v. Tate*, No. 21-3436, 2022 U.S. App. LEXIS 11440, at *5–8 (6th Cir. Apr. 26, 2022))).

It may be argued that Brooks should have been wary of making assumptions about what was happening in the obstructed portions of the video, but such a failure would be "at most, negligent, which is insufficient to trigger a *Franks* hearing." *Prideaux-Wentz*, 543 F.3d at 962 ("Even if [law enforcement] should have somehow been more thorough or careful in [its] analysis of the photos, or if . . . [it] should have followed up . . . to get more information about the uploaded photos, this failure was, at most, negligent, which is insufficient to trigger a *Franks* hearing." (citing *United States v. Swanson*, 210 F.3d 788, 791 (7th Cir. 2000))); *see also United States v. Gotti*, 42 F. Supp. 2d 252, 280 (S.D.N.Y. 1999) (holding that differing reasonable interpretations of conversations do not warrant a *Franks* hearing when the meaning of those conversations is ambiguous). "Even if the innocent explanation were correct"—that Defendant held onto the keys as he approached the door merely to remotely lock the car but not to unlock the door to the Residence—"the fact that an affiant may have been mistaken in some of his interpretations . . . will not invalidate his affidavit if he had been justified in his presumptions . . . ." *United States v. Lauria*, No. 3:23-cr-62-4 (OAW), 2024 U.S. Dist. LEXIS 181258, at *5 (D. Conn. Oct. 3, 2024) (citing *United States v. Feola*, 651 F. Supp. 1068, 1096 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989)). Such is the case here, and so the Court will overrule Defendant's objection. Defendant's motion for a *Franks* hearing is subject to denial on this basis alone.

Defendant also objects to Magistrate Judge Dries's conclusion that these alleged misrepresentations would have been, in any event, immaterial. ECF No. 39 at 13. Magistrate Judge Dries concluded that the affidavit would have supplied probable cause to search even if the allegedly material misrepresentations had been omitted and the allegedly material

omissions been included. ECF No. 37 at 20–22. The Court departs from Magistrate Judge Dries on this aspect of the analysis, simply because it has already concluded *supra* Section 4.1.3.3 that probable cause was lacking. That conclusion does not, however, alter the ultimate disposition of Defendant's motion for a *Franks* hearing; Defendant has not made a "substantial preliminary showing" that Brooks made "a false statement knowingly and intentionally, or with reckless disregard for the truth." *Franks*, 438 U.S. at 155. Defendant's motion for a *Franks* hearing can accordingly be denied on its merits.

Accordingly,

**IT IS ORDERED** that Magistrate Judge Stephen C. Dries's report and recommendation, ECF No. 37, be and the same is **ADOPTED in part and OVERRULED in part** as discussed herein;

**IT IS FURTHER ORDERED** that Defendant Fernando D. Bolden's objections to Magistrate Judge Stephen C. Dries's report and recommendation, ECF No. 39, be and the same are **SUSTAINED in part and OVERRULED in part** as stated herein; and

**IT IS FURTHER ORDERED** that Defendant Fernando D. Bolden's motion to suppress and for a *Franks* hearing, ECF No. 27, be and the same is hereby **DENIED.**

Dated at Milwaukee, Wisconsin, this 22nd day of November, 2024.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge